**CREEDON & FELICIANI, P.C.**                    Attorney for Plaintiffs
BY: JOSEPH L. FELICIANI, ESQUIRE
I.D. No. 32357
BY: HEATHER A. THOMAS, ESQUIRE
I. D. #: 201293
29 E. Marshall Street
Norristown, Pa.  19401
Phone: (610) 239-9630
Facsimile: 610-239-1599
e-mail: jfeliciani@cflawpc.com
13000

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Leonard Grande, Keith Clerkin, Dina Clerkin, Paul Lutz, Darlene Lutz, James Seacrease, Valarie Seacrease, Patrick D. Enwright, Barbara Ann Garcia, Jeffrey Smith, Gloria Smith, and Kathleen M. Clapp<br><br>Plaintiffs<br>v.<br>The 3M Company (f/k/a Minnesota Mining and Manufacturing Co.), Angus Fire (a/k/a Angus International) Ansul (a/k/a Ansul Chemical Company a/k/a The Ansul Company a/k/a Ansul Fire Protection) Buckeye Fire Protection Company, Chemguard, and National Foam<br><br>Defendants | CIVIL ACTION<br><br>NO.: |

Plaintiffs, Leonard Grande, Keith Clerkin, Dina Clerkin, Paul Lutz, Darlene

Lutz, James Seacrease, Valarie Seacrease, Patrick D. Enwright, Barbara Ann Garcia, Jeffrey Smith, Gloria Smith, and Kathleen M. Clapp, individually and on behalf of all others similarly situated, (hereinafter collectively referred to as "Plaintiffs",  by and through their counsel, Creedon & Feliciani, P.C.,  as and for their complaint against defendants, The 3M Company (f/k/a Minnesota Mining and Manufacturing Co.), Angus Fire, The Ansul Company, Buckeye Fire Protection Company, Chemguard, and National Foam (hereinafter collectively referred to as "Defendants" allege as follows:

## INTRODUCTION

Plaintiffs bring this cause of action for medical monitoring and property damage as a result of their exposure to water contaminated with toxic chemicals resulting from Defendants' harmful and defective products, aqueous firefighting foams ("AFFF") and other materials containing perfluorochemicals (PFCs) including perfluorooctanesulfonic acid ("PFOS") and related fluorochemicals that can degrade to perfluorooctanoic acid ("PFOA") or PFOS,  which were released onto the ground, into the environment and infiltrated the groundwater and Plaintiffs' drinking/potable water.

## PARTIES

### Plaintiffs

1.      The Plaintiffs are all individuals who resided near and/or served and/or worked on the Naval Air Station Joint Reserve Base- Willow Grove (hereinafter referred

to NASJRB-Willow Grove) and Naval Air Warfare Center (f/k/a Naval Air Development Center, Johnsville).  (NASJRB-Willow Grove and Naval Air Warfare Center (f/k/a Naval Air Development Center, Johnsville are hereinafter referred to as "Bases")

2.    Plaintiff, Leonard Grande, is and adult individual residing at 998 Limekiln Pike, Ambler, PA 19002 with water service provided by the Horsham Water and Sewer Authority.

3.    Plaintiffs, Keith Clerkin and Dina Clerkin are husband and wife adult individuals currently residing at 421 Bensol Road, Hatboro, PA 19040.

4.    From 1997 to 2013, the Clerkins resided at 10 Oxford Lane, Horsham, PA 19044 with water service provided by Horsham Water and Sewer Authority.

5.    Plaintiffs, Paul Lutz and Darlene Lutz, are husband and wife adult individuals residing at 113 Sonoma Way, Macungie, PA.

6.    At all relevant times hereto, Mr. Lutz served in the United States Navy and stationed at the Naval Air Station Joint Reserve Base Willow Grove and Mr. and Mrs. Lutz consumed water provided on base and in cafés, restaurants, and other eating and drinking establishments within the Affected Area.

7.    Plaintiffs, James Seacrease and Valarie Seacrease are husband and wife adult individuals residing at 230 Heatherfield Drive, Souderton, PA 18964.

8.    Mr. and Mrs. Seacrease both served as civilian personnel on the Naval Air Station Joint Reserve Base Willow Grove and consumed water provided on base and in cafés, restaurants, and other eating and drinking establishments within the Affected

Area.

9.      Plaintiff, Patrick D. Enwright, is an adult individual residing at 1561 Hartsville Circle, Warminster, PA 18974 and serviced by Warminster Water Authority.

10.      Plaintiff, Barbara Ann Garcia, is an adult individual residing at 9 Valentine Road, Ivyland, PA 19874 with water service provided by the Warminster Water Authority.

11.      Plaintiffs, Jeffrey and Gloria Smith, are husband and wife adult individuals residing at 1949 County Line Road, Warrington, PA with private well water.

12.      Plaintiff, Kathleen M. Clapp, is an adult individual currently residing at 16474 Gloria Lane, Nokomis, Florida 34275 formerly residing at 585 Skyhawk Drive, Warminster PA 18974 and 269 Gibson Avenue, Warminster, PA 18974 with water service supplied by Warminster Water Authority and consumed water supplied on the base at NADC JACKSONVILLE as well as in café's, restaurants, and other eating and drinking establishments within the Affected Area.

**Defendants**

22.      Defendant The 3M Company (f/k/a Minnesota Mining and Manufacturing Company) ("3M") is a corporation organized and existing under the laws of the state of Delaware, having its principal place of business at 3M Center, St. Paul, Minnesota 55133.

23.      In the 1940s and 1950s, 3M began creating perfluorochemicals (PFCs)

and began incorporating them in their products after recognizing their beneficial surfactant properties.

24.     In the early 1960s, 3M developed its aqueous film forming foam (AFFF) using the surfactant containing PFCs and began to market it under the brand name "Light Water™".

25.     3M promoted and sold the AFFF for the purposes of preventing, suppressing and extinguishing fires involving aviation fuel and other flammable liquids.

26.     Through at least 2002, 3M manufactured and sold the AFFF containing PFCs and fluorocarbon surfactants.

27.     Defendant Angus Fire (a/k/a Angus International) ("Angus") is part of Angus International, and has corporate headquarters   in Bentham, United Kingdom. Angus Fire maintains a place of business in the United States at 141 Junny Road, Angier, NC 27501.

28.     At all times relevant, Angus manufactured fire suppression products including AFFF that contained PFCs including PFOS and/or related fluorochemicals that can degrade to PFOA or PFOS.

29.     Defendant, Ansul (a/k/a Ansul Chemical Company a/k/a The Ansul Company a/k/a Ansul Fire Protection) (hereinafter "Ansul") is a Wisconsin corporation, having a principal place of business at One Stanton Street, Marinette, WI

54143.

30.     At all times relevant, Ansul manufactured fire suppression products, including AFFF that contained PFCs including PFOS and/or related fluorochemicals that can degrade to PFOA or PFOS.

31.     Defendant, Buckeye Fire Equipment Company ("Buckeye") is a North Carolina corporation, with its principal place of business at 110 Kings Road, Kings Mountain, NC 28086.

32.     At all times relevant, Buckeye manufactured fire suppression products, including AFFF that contained PFCs including PFOS and/or related fluorochemicals that can degrade to PFOA or PFOS.

33.     Chemguard, Inc. is a Wisconsin corporation, having a principal place of business at One Stanton Street, Marinette, WI 54143.

34.     At all times relevant, Chemguard manufactured fire suppression products, including AFFF that contained PFCs including PFOS and/or related fluorochemicals that can degrade to PFOA or PFOS.

35.     National Foam, Inc. (a/k/a Chubb National Foam) (National Foam, Inc. and Chubb National Foam are collectively referred to as "National Foam") is a Pennsylvania corporation, having a principal place of business at 350 East Union Street, West Chester, Pennsylvania 19382.

36.     At all times relevant, National Foam manufactured fire suppression products, including AFFF that contained PFCs including PFOS and/or related fluorochemicals that can degrade to PFOA or PFOS.

## JURISDICTION AND VENUE

37.     Jurisdiction is proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because members of the proposed Plaintiff classes are citizens of states different from at least some of Defendants' home states, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

38.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the events or omissions by Defendants giving rise to the claims asserted herein occurred in this District, have caused harm to Class/Subclass Members residing in this District, and Plaintiffs Leonard Grande, Keith Clerkin, Dina Clerkin, Paul Lutz, Darlene Lutz, James Seacrease, Valarie Seacrease, Patrick D. Enwright, Barbara Ann Garcia, Jeffrey Smith, and Gloria Smith, reside in this District.

## CLASS ACTION ALLEGATIONS

39.     All allegations, supra. are incorporated herein as if specifically set forth herein at length.

40.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23 (a), (b)(2) and (b)(3) on behalf of a Class consisting of all other persons similarly situated as members of the proposed classes.

41.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all other persons similarly situated as members of the proposed classes/subclasses:

### Class Members

All persons who own or occupy residential properties in the geographic

areas represented on the map attached hereto as Exhibit "A" ("Affected Area") and any and all military and/or civilian personnel who have served/worked and/or are serving/working on the said Bases.

**Subclasses:**

**Public Water Subclass**
Current property owners who have resided in their current residence for at least one year since 1970 and who obtain(ed) their drinking water from either: Horsham Water and Sewer Authority, Warminster Public Authority, or Warrington Township Water and Sewer Department.

**Private Well Subclass**

Current property owners who have resided within the Affected Area for at least one year since 1970 and who obtain their drinking water from a private well.

**Non-Property Owner Subclass**
Non-property owners who obtained their drinking water for at least a one-year period from 1970 to the present from the Horsham Water and Sewer Authority, Warminster Public Authority, or Warrington Township Water and Sewer Department; from a well located on the Bases; or from a private well within the Affected Area.

42.     The Public Water Subclass, Private Good Subclass and Non-Property Owner Subclass are hereinafter referred to collectively as "Subclasses".

43.     Excluded from the Class are: (a) Defendants, any entity or division in which Defendants have a controlling interest, and their legal representatives, officers, directors, assigns, and successors; (b) the Judge to whom this case is assigned and the Judge's staff; (c) any State or any of its agencies; and (e) the cities, towns, boroughs, townships of Horsham, Warminster, Warrington, Ivyland, Hatboro, Southampton and Ambler and the respective water and sewer authorities/districts.

44.     The Class satisfies the numerosity, commonality, typicality, adequacy,

predominance, and superiority requirements of Fed. R. Civ. P. 23.

## Numerosity

45.     The members of the Class are so numerous that joinder of all members is impracticable. The population in the Class Geographic Area is estimated to include well over 70,000 residents. Plaintiffs believe that there are thousands of members of the Class who own and/or occupy properties have been impacted by PFCs from Defendants' AFFF as described herein. Members can be easily identified from public records, such as property tax records, public water records, and other public records and notified of the pendency of this action by mail, publication, or via other public forums.

46.     In addition, members of the class also include the military and civilian personnel who have served/have worked upon the bases which is estimated to include well over 5,000 individuals.  Members can be easily identified from service records and/or employment records, other public records and notified of the pendency of this action by mail, publication or via other public forums.

## Typicality

43.     Plaintiffs' claims are typical of the claims of the members of the Class since all members of the Class are similarly affected by Defendants' conduct resulting in injury to all members of the Class.

## Adequate Representation

44.     Plaintiffs will fairly and adequately protect the interests of members of the

Class and have retained counsel competent and experienced in civil actions including environmental litigation.

45.     Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Class/Subclasses and have the resources to do so.

46.     Neither Plaintiffs nor their counsel has interests adverse to any of the Classes/Subclasses.

## Predominance of Common Questions

47.     Plaintiffs bring this action under Rule 23(b)(3) because numerous questions of law and fact common to class members predominate over any question affecting only individual members. The answers to these common questions will advance resolution of the litigation as to all class members.  These common legal and factual issues include:

   a.  Whether Defendants owed a duty to Plaintiffs and members of the Class/Subclasses and whether Defendants breached that duty;
   b.  Whether Defendants knew or should have known that their manufacture of AFFF containing PFCs and perhaps other toxic chemicals was unreasonably dangerous;
   c.  Whether Defendants knew or should have known that their AFFF contained persistent, stable and mobile chemicals that were likely to contaminate groundwater water supplies;
   d.  Whether Defendants failed to sufficiently warn purchasers and users of the harm that could and did result from use of their products;
   e.  Whether Defendants became aware of health and environmental harm caused by PFCs in their AFFF products and failed to warn purchasers, users, Plaintiffs and the Class/Subclasses of same; and
   f.  Whether the members of the Classes/Subclasses have sustained damages and the proper measure of damages.
   g.  Whether Defendants are strictly liable to Plaintiffs and the Class/Subclasses for their actions;

## Superiority

48.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable.

49.     Defendants have acted on grounds generally applicable to the Class/Subclasses, thereby making appropriate final legal and equitable relief with respect to the class/subclasses as a whole.

50.     Furthermore, the expense and burden of individual litigation outweighs the individual damages suffered by individual Class/Subclass members, making it impossible for members of the Class/Subclasses to individually redress the wrongs done to them.

51.     Furthermore, as the damages suffered by individual Subclass members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Subclasses to individually redress the wrongs done to them.

52.     Class treatment of common questions of law and fact will conserve the resources of the courts and the litigants, and will promote consistency and efficiency of adjudication.

53.     There will be no difficulty in the management of this action as a class action.

<u>**RULE 23(c)(4)**</u>
**CERTIFICATION OF PARTICULAR**
<u>**ISSUES**</u>

54.     In the alternative to certification under Rule 23(b)(2) or 23(b)(3), Plaintiffs and the Class/Subclasses seek to maintain a class action with respect to particular issues under Rule 23(c)(4).

55.     The adjudication of each Defendant's liability jointly and severally involves issues and questions common to the entire Class/Subclasses, such that certification pursuant to Rule 23(c)(4) is appropriate.

**GENERAL FACTUAL**
<u>**ALLEGATIONS**</u>

<u>Background Regarding PFOS and PFOA</u>

56.     All allegations, <u>supra.</u> are incorporated herein as if specifically set forth herein at length.

57.     Poly-and perfluorinated alkyl substances (hereinafter referred to as PFASs) have been in use for over sixty (60) years.

58.     In the 1940s and 1950s, Defendant, 3M Company, began creating perfluorochemicals (PFCs) and began incorporating them in their products after recognizing their beneficial surfactant properties.

59.     PFCs are manmade chemicals and do not exist naturally in nature.

60.     Perfluorooctanesulfonic acid ("PFOS") and perfluorooctanoic acid ("PFOA") are the two (2) most prevalent compounds of PFCs which contain numerous

chemicals.

61.     In the early 1960s, Defendant, 3M Company, engineered, designed and developed its aqueous film forming foam (AFFF) using the surfactant containing PFCs and began to market it under the brand name "Light Water™".

62.     The AFFF contained PFCs including PFOS and related fluorochemicals that can degrade to PFOA or PFOS.

63.     Defendant, 3M Company, promoted and sold the AFFF for the purposes of preventing, suppressing and extinguishing fires involving aviation fuel and other flammable liquids.

64.     Upon information and belief, it is averred that Defendants, Ansul, Buckeye, Chemguard, and National Foam, also engineered, developed, manufactured, marketed and sold AFFF contained PFCs including PFOS and related fluorochemicals that can degrade to PFOA or PFOS.

65.     PFOS and PFOA  have unique properties that cause them to be classified as persistent, bioaccumulative, and toxic.

66.     Bioaccumulation refers to the accumulation of substances, such as chemicals, in an organism.

67.     Bioaccumulation occurs when an organism absorbs a possibly toxic - substance at a rate faster than that at which the substance is lost by catabolism and excretion.

68.     PFOS and PFOA show persistence that make them an environmental hazard.

69.     Due to the strength of multiple carbon- fluorine bonds, PFOS and PFOA degrade very slowly in the environment.

70.     PFOS and PFOA are thermally, chemically, and biologically stable and resistant to biodegradation, atmospheric oxidation caused by the action of light, direct photolysis, and hydrolysis.

71.     PFOS and PFOA can remain in the environment for decades.

72.     PFOS and PFOA can leach through soil and infiltrate and pollute groundwater and the environment.

73.     Once water is contaminated by PFOS or PFOA, it cannot be removed by boiling the water or using chlorine and other disinfectants that are typically added to public drinking water systems

74.     Toxicology studies show that PFOS and PFOA are readily absorbed after oral exposure and accumulate primarily in the serum, kidney, and liver.

75.     PFOS and PFOA can bioaccumulate up the food chain; can cross the placenta from mother to fetus and from mother to infant through breast feeding.

76.     Once ingested, PFOS and PFOA have a half-life within the human body of 2 to 9 years.

77.     PFOS and PFOA are toxic and have negative health effects on humans.

78.     There are a number of health risks associated with exposure to PFOS

and PFOA, and these risks are present even when PFOS and PFOA are ingested at seemingly low levels (less than 1 part per billion).

79.     PFOS and PFOA exposure is associated with increased risk of various diseases and cancers in humans, including, but not limited to: testicular cancer, kidney cancer, prostate cancer, multiple myeloma, disorders such as thyroid disease, high cholesterol, ulcerative colitis, and pregnancy-induced hypertension, non-Hodgkin lymphoma, increased uric acid as well as other conditions.

80.     Epidemiological studies are ongoing and the full harm of PFOA and PFOS exposure is not completely understood.

81.     Epidemiological  studies of animals exposed to PFOA have found exposure to PFOA increases the risk of certain tumors of the liver, testicles, mammary glands (breasts), and pancreas in these animals. In general, well-conducted studies in animals do a good job of predicting which exposures cause cancer in people.

82.     The EPA has also advised that exposure to PFOS and PFOA may   result in developmental effects to fetuses during pregnancy or to breastfed infants.

83.     Injuries, however, are not sudden; rather, they can arise months, years or decades after exposure to PFOS and/or PFOA.

84.     The Defendants also knew or should have known that PFCS are highly soluble in water, and highly mobile and highly persistent in the environment, and highly likely to contaminate water supplies if released into the environment.

85.     The Defendants marketed and sold their products, AFFF, with

knowledge that large quantities of their toxic, harmful and defective product, AFFF, would be used in training exercises and in emergency situations at Military bases and civilian fire facilities in such a manner that dangerous chemicals would be released into the environment.

86.     As discussed in more detail below, PFOS and PFOA contamination has been discovered in the wells of and surrounding the Naval Air Station Joint Reserve Base- Willow Grove (hereinafter referred to NASJRB-Willow Grove) and Naval Air Warfare Center (f/k/a Naval Air Development Center, Johnsville).  (NASJRB-Willow Grove and Naval Air Warfare Center (f/k/a Naval Air Development Center, Johnsville are hereinafter referred to as "Bases")

87.     Upon information and belief, the PFOS and PFOA contamination of the public and private wells and Plaintiffs' drinking/potable water supply is the result of the discharge of AFFF manufactured by the Defendants and used on the Bases.

<u>MILITARY SPECIFICATION FOR AFFF</u>

88.     In 1969, the Department of the Navy issued Military Specification MIL-F-24385 for AFFF.

89.     A Military Specification is a document that describes the physical and/or operational characteristics that a product must meet before purchase by the United States military.

90.     That is, in order for an AFFF manufacturer to sell its AFFF to the Navy, it was required to meet MIL-F-24385.

91.     MIL-F-24385 covered "the requirements for aqueous film-forming foam

(AFFF) liquid concentrate fire extinguishing agents consisting of fluorocarbon surfactants and other compounds" as required to meet certain performance standards that were also set forth in MIL-F- 24385.

92.     If the Navy found that a manufacturer's product satisfied MTL-F-24385 performance expectations, the Navy placed the product on the Department of Defense Qualified Product Listing.

93.     3M, Angus, Ansul, Buckeye, Chemguard, and National Foam each engineered, designed, manufactured, distributed and sold AFFF that was included on the Department of Defense Qualified Product Listing for MIL-F- 24385.

94.     Although MIL-F-24385 required the use of a "fluorocarbon surfactant," it did not specify a particular chemical, such as PFOS or another Toxic Surfactant.

95.     Upon information and belief, 3M, Angus, Ansul, Buckeye, Chemguard, and National Foam each chose a Toxic Surfactant to manufacture their MIL-F- 24385-compliant AFFF.

96.     The Defendants manufactured, marketed, sold and introduced into the stream of commerce via sale to the Commonwealth of Pennsylvania and Agencies of the Commonwealth of Pennsylvania including but not limited to the Pennsylvania Air National Guard serving at Naval Air Station Joint Reserve Base- Willow Grove (hereinafter referred to NASJRB-Willow Grove) the said harmful and defective products known as Aqueous Film Forming Foam (hereinafter "AFFF") which is a fire fighting suppressant.

97.     The said AFFF was sold to the US Navy, US Air Force, and Pennsylvania Air National Guard for use on its various and numerous naval vessels and at military bases including NASJRB-Willow Grove and Naval Air Warfare Center (f/k/a Naval Air Development Center, Johnsville).  (NASJRB-Willow Grove and Naval Air Warfare Center (f/k/a Naval Air Development Center, Johnsville are hereinafter referred to as "Bases")

98.     Defendants knew or should have known that their harmful and defective products, AFFF, would be used for various purposes on said Bases, including but not limited to: training for firefighting, actual firefighting, and use in hangar sprinkler fire suppressant systems.

99.     Defendants knew or should have known that their harmful and defective products, AFFF, would drain into the ground and soil polluting and/or contaminating same and would migrate into the ground water of the Bases and eventually into the drinking/potable water of the Plaintiffs.

100.     The harmful and defective products, AFFF, manufactured by the Defendants contained "fluorocarbon surfactants," believed to include PFOS, PFOA, and/or certain other perfluorinated compounds ("PFCs") that degrade into PFOS or PFOA. (PFOS, PFOA and the PFCs that degrade into PFOS or PFOA are hereinafter referred to as "Toxic Surfactants.") The Defendants ' precise formulas for their AFFF during the relevant period have not been made public.

101.     In its Military Specification (a/k/a and hereinafter referred to as "MILSPEC") for Fire Extinguishing Agent, Aqueous Film Forming Agent (AFFF), the

United States of America, through its said Agencies, required that "The material shall have no adverse effect on the health of personnel when used for its intended purpose."

102.    The Defendants manufactured and/or sold their harmful and defective products, AFFF, when they knew or should have known that their products had an adverse effect on the health of persons when used for its intended purposes.

103.    The Defendants failed to warn about the adverse and harmful health effects of their harmful and defective AFFF products, when they knew or should have known that their products had an adverse effect on the health of persons when used for its intended purposes.

104.    While using the harmful and defective products for its intended purposes, the said harmful and defective products including Toxic Surfactants were released into the environment contaminating the soil and groundwater of the bases and migrated into groundwater and eventually into the drinking/potable water of the Plaintiffs.

105.    The infiltration of the said harmful and defective products which including Toxic Surfactants, was in violation of the Federal and State statutes and laws.

106.    The polluted and contaminated water from the Bases migrated into the drinking/potable water which was ingested by the residents surrounding the Bases as well as the military personnel serving upon said bases and/or living in said neighborhoods and civilian personnel working on said Bases.

107.     It was reasonably foreseeable to Defendants that Plaintiffs and the Plaintiff Class, as users of groundwater that supplied the wells near the Bases, would use and consume groundwater affected by the use of their products at the Bases and would be damaged by such uses.

108.     In the 1970s-1980s, the Defendants were well aware of the health risks and adverse human health effects of exposure to the harmful and defective products which contained Toxic Surfactants.

109.     Despite said knowledge, the Defendants continued to manufacture, market, sell and/or introduce into the stream of commerce their harmful and defective products, AFFF, without warning and/or sufficiently warning consumers, purchasers, users and reasonably foreseeable innocent bystanders, such as Plaintiffs and the Plaintiff Class/Subclasses,  of the health risks and/or adverse human health effects and failed to recall their defective and harmful products when the said defective and harmful products were taken off of the market.

110.     By continuing to manufacture, market, sell and/or introduce its harmful and defective products into the stream of commerce, the Defendants violated various Federal and State statutes and/or laws.

111.     The Defendants, as the manufacturers of AFFF, knew or should have known that the inclusion of PFOS and related fluorochemicals that degrades to PFOA or PFOS in AFFF presented an unreasonable risk to human health and the environment.

### AFFF Use at the Willow Grove and Warminster Bases

112.     At any given time during their operation, the Bases housed thousands of gallons of AFFF concentrate manufactured by Defendants, which were/are stored in buckets, drums, tankers and sprinkler systems.

113.     U.S. Navy, Air National Guard, Marines, and Air Force (hereinafter referred to collectively as "Military'") personnel, as well as civilian firefighters, conducted training exercises at the Bases.

114.     In part, the Military and civilian firefighters engaged in firefighting and explosion training that required the use of AFFF.

115.     For decades, firefighting training activities took place at the two military Bases.

116.     Each site also possessed and maintained aircraft hangars protected by ceiling fire suppression units holding hundreds of gallons of AFFF.

117.     The use of AFFF for training purposes included suppressing fires and explosions on the ground, as well as coating runways in anticipation of difficult landings, all of which resulted in acres of foam-covered soil and blanketed wreckages.

118.     Upon information and belief, accidental discharges occasionally occurred within the aircraft hangars resulting in the discharge of hundreds of gallons of AFFF. The personnel at the Bases cleaned the hangars by washing the foam down drains which leached into the ground water which provided drinking/potable water to those serving and working on the bases.

119.    Once the ground water of the bases was contaminated and polluted with PFOA and PFOS, military and civilian personnel on the base became exposed to PFOA and PFOS in their drinking/cooking water, bathing water, etc.

120.    The polluted and contaminated ground water found its way into the aquifer and into the drinking/potable water of the areas identified, supra.

121.    Once PFOA and PFOS contaminated and polluted the drinking/potable water in the Affected Area, military and civilian personnel stationed on the bases were exposed to PFOA and PFOS in their drinking/cooking water, bathing water, etc. while living in the areas off the bases and/or while eating, drinking, etc. in restaurants, cafes, homes of friends, etc. in the said areas.

122.    Once PFOA and PFOS contaminated and polluted the drinking/potable water in the areas identified, the residents of said areas were exposed to PFOA and PFOS in their drinking/cooking water, bathing water, etc. while living and working in the said Affected Area and/or while eating, drinking, etc. in their homes, the homes of friends, restaurants, cafes, etc.  in the said areas.

123.    At all times mentioned in paragraphs 122 and 123 the individuals ingesting the polluted and contaminated water/food/sustenance were unaware that they were consuming/ingesting polluted and contaminated substances containing PFOA and PFOS.

124.    Upon information and belief, instructions and warning labels affixed to AFFF by the Defendants did not adequately describe the scope of danger associated with use and disposal of AFFF.

125.     Upon information and belief, at no time during the relevant period did the Defendants warn users of the AFFF that ingredients in the AFFF were persistent, bioaccumulative and toxic, or that, once introduced into the environment, its chemical components would readily mix with ground and surface water and migrate off the Bases, contaminating the surrounding communities.

126.     In 2002, 3M ceased production of AFFF manufactured with PFOS due to health and environmental concerns.

127.     Upon information and belief, 3M and the other defendants had known of these dangers for years, if not decades.

128.     Even though 3M, who was the predominant manufacturer of PFOS-based AFFF, ceased production of PFOS-based AFFF in 2002, neither 3M nor any other Defendant that used these Toxic Surfactants recalled its dangerous products.

129.     Consequently, upon information and belief, Military personnel and civilians at the Bases continued to use PFOS-laden AFFF for trainings and emergencies until the base closed in 2011.

130.     According to one study, as of 2011, there were still 1,972,000 gallons of PFOS-based AFFF stockpiled in the United States.

131.     Further, upon information and belief, the Military continues to store the PFOS-based AFFF on the Bases.

**Regulatory Action for Safe Drinking Water**

132.     In 2012, the EPA included PFOS and PFOA in its Third Unregulated Contaminant Monitoring Rule ("UCMR3"). By placing PFOS and PFOA

on this list, the EPA required certain water providers across the country, including those in the Affected Area, to test their water for the presence of PFOS and PFOA.

133.    In 2014, the Horsham Water and Sewer Authority tested its public wells in accordance with UCMR3. The testing showed that two of its wells were contaminated with PFOS above the PHAL of 200 ppt.  The Horsham Water and Sewer Authority immediately shut off those wells.

134.    Subsequently, the Horsham Water and Sewer Authority re-tested all of its   active wells using a more sensitive test. When the Horsham Water and Sewer Authority re-tested its wells, each of its wells showed contamination from PFOS and/or PFOA.  Horsham eventually shut down five of its wells due to PFOS and/or PFOA contamination.

135.    Between November 2013 and June 2014, the Warminster Public Authority also tested its wells in compliance with UCMR3. The testing showed PFOS levels ranging from 40 ppt to 1090 ppt and PFOA levels ranging from 20 ppt to 890 ppt. The Warminster Public Authority closed six of its wells due to PFOS and/or PFOA contamination.

136.    Warrington Township also participated in UCMR3 during 2014 and 2015. The testing showed PFOS levels as high as 1600 ppt and PFOA levels up to 270 ppt. Warrington Township initially closed three of its wells, and eventually closed five of its wells due to PFOS and/or PFOA contamination.

137.    Public water treatment plants in the Horsham, Hatboro, Warminster, Warrington, Ivyland, Southampton and other areas surrounding the bases were/are not

equipped to filter PFOS and PFOA from polluted and contaminated water.

138.     Private wells used for drinking/potable water in Horsham, Hatboro, Warminster, Warrington, Ivyland, Southampton and other areas surrounding the bases were/are not equipped to filter PFOS and PFOA from polluted and contaminated water.

139.     The widespread discovery of contaminated public drinking water wells led the EPA to call for testing of private drinking water wells within the area.

140.     Since the summer of 2014, the EPA has tested numerous private and public wells in the vicinity of the Bases. The EPA began reporting the results of the tests during the Fall of 2014, at which point the Provisional Health Advisory Levels (PHAL) remained at 200 ppt for PFOS and 400 ppt for PFOA. Even at that time, several private and public wells tested above the PHALs.

141.     In May 2016, the EPA set its Health Advisory for Lifetime Exposure at 70 ppt for the sum of PFOA and PFOS concentrations in drinking water.

142.     Other states and/or organizations have suggested limiting exposure to even lower levels of PFOS and/or PFOA.

143.     Negative health outcomes associated with exposure to PFOA-contaminated drinking water at 50 ppt has been found in a scientific study in and around Parkersburg, West Virginia.

144.     Certain states have also promulgated advisory exposure levels lower than the EPA 's advisory level, including the State of New Jersey, which promulgated an advisory exposure level for PFOA of 14 ppt and the State of Vermont, which set its

enforcement standard at 20 ppt for PFOA and 30 ppt for PFOS.

145.    As a result of the testing performed after the EPA's May 2016 Lifetime Health Advisories were issued for PFOS and PFOA, numerous residents, including the named Plaintiffs learned that their drinking/potable water supply was contaminated with dangerous levels of PFOS and/or PFOA.

146.    The United States of America, through the Department of the Navy, has offered assistance to several impacted residents, but its efforts are too little, too late.

147.    The contamination of the public and private drinking/potable water wells in the areas surrounding the Bases with high concentration levels of PFOS and PFOA has been directly linked to the Defendant's manufacture of AFFF thorough the use of the defective/harmful product on the Bases.

148.    As set forth herein, Despite said knowledge, the Defendants continued to manufacture, market, sell and/or introduce into the stream of commerce their harmful and defective products, AFFF, without warning and/or sufficiently warning consumers, purchasers, users and reasonably foreseeable innocent bystanders, such as Plaintiffs and the Plaintiff Class/Subclasses, of the health risks and/or adverse human health effects and failed to recall their defective and harmful products when the said defective and harmful products were taken off of the market.

138.    Since 2014, many private and public drinking/potable drinking water wells tested within the Affected Area have shown concentrations of PFOS and *PFOA.*

139.    Multiple studies suggest that even small concentrations of PFCs are harmful to humans.

140.    All persons within the Affected Areas including those serving and/or working on the Bases have right to clean, drinkable, potable water free of PFOS and PFOA under the Constitutions of the United States of America and the Commonwealth of Pennsylvania.

149.    In spite of numerous meetings sponsored by governmental entities and citizens' groups, as well as calls for actions by various Federal and State elected officials, the persons effected as described herein have not been advised when or if their drinking/potable water will ever be free of PFOS and PFOA contamination in their public and private wells.

150.    Further, in spite of the agreement of these citizens' groups and Federal and State officials, that blood testing and health monitoring is important and critical for the effected classes, said blood testing and health monitoring have not been provided nor have plans been put in place to provide said testing and monitoring at any time in the future.

151.    As a consequence of the contaminated water within the public water systems and private wells, many residents have suffered a loss of use and enjoyment of their properties, and their contaminated properties are less attractive to prospective buyers/renters and have diminished in value.

152.    As a further consequence of the contaminated water infiltrating their private wells, many individuals in the class/subclasses have suffered economic loss in efforts to remove PFOA and PFOS contaminates from the drinking/potable water.

153.    In addition, individuals serviced by public water systems suffered

economic loss as a result of the public water authorities being forced to purchase alternative sources of drinking/potable water.

### Rule 23(b)(2) Injunctive Relief

154.    In addition to the above, Plaintiffs bring this class action under Rule 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Class/Subclasses as a whole, such that final injunctive relief is appropriate with respect to each of the Class/Subclasses as a whole.

155.    Such injunctive relief includes, but is not limited to, an injunction to require the implementation and funding of a blood serum testing program for the Plaintiffs and the Class/Subclasses to test for the presence of PFOS and/or PFOA in their blood serum; and the implementation and funding of a medical monitoring program for the Plaintiffs and the Class/ Subclasses sufficient to monitor the Plaintiffs' and Class/Subclasses' health to ensure they are adequately protected from the deleterious effects of PFOS and PFOA on the human body.

### CAUSES OF ACTION

### COUNT I

### Medical Monitoring, Health Effects and Health Assessment Studies

156.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if they were set forth at length herein.

157.    PFOS and PFOA are proven hazardous substances.

158.    PFOS has been determined to be persistent, bioaccumulative and toxic to mammalian species.

159.    In addition, PFOA has been classified by the International Agency for Research on Cancer (IARC) as a Group 2B carcinogen due to evidence of carcinogenicity in humans and experimental animals.

160.    Published peer-reviewed scientific studies have shown that substantial exposure to PFOA and PFOS is associated with increased incidences of various types of cancers as compared with the general population, including, but not limited to: Prostate Cancer, Testicular Cancer, Bladder Cancer, Colon Cancer, Kidney Cancer, Rectal Cancer, Pancreatic Cancer, Esophageal Cancer, Laryngeal cancer, Skin Cancer, Uterine/Cervical Cancer, Breast Cancer, Multiple Myeloma, Non-Hodgkin's lymphoma, and Leukemia.

161.    These studies have also shown that substantial exposure to PFOA and PFOS is associated with increased incidences of other chronic diseases and conditions as compared with the general population including, but not limited to the following: Cardiovascular Disease, Cerebrovascular Disease, Osteoarthritis, Ulcerative Colitis, Liver Disease, Liver Disorders and Abnormal Liver Functions, Increased serum cholesterol, Hyperuricemia , Decreased Birth Weight (when exposed in utero), Autoimmune diseases and disorders, Thyroid Disease and disorders, Endocrine and Metabolic Disorders, High Blood Pressure, Hypertension, Pregnancy Induced Hypertension, Decreased Immune Function and Response to Immunizations, Mental Disorders, Psychoneurotic Disorders, and Developmental Disorders and Delays in

Children.

162.    As a result of the Defendants' negligence, the Plaintiffs and Members of the Class/Subclasses have been exposed to levels of PFOS and PFOA greater than the normal background levels.

163.    As a proximate result of their exposure to PFOS and PFOA, the Plaintiffs and the Members of the Class/Subclasses have a significantly increased risk of contracting serious latent diseases and/or disorders including but not limited to those cancers and medical conditions listed, supra.

164.    Diagnoses of and early treatment for the cancers, diseases and conditions, supra, in Plaintiffs and Members of the Class/Subclasses is paramount for detecting and mitigating long term health consequences.

165.    Medical monitoring can identify abnormalities that are precursors for the cancers, diseases and conditions listed, supra.

166.    Well-established and specialized medical monitoring procedures exist to monitor the health condition of the Plaintiffs and members of the Class/Subclasses, provide for early diagnosis of and treatment for the subject diseases and conditions, supra, and are reasonably necessary to provide for early diagnosis, leading to significant benefits in treatment, management, rehabilitation and prevention or mitigation of long term health consequences.

167.    Some of these medical monitoring tests and procedures include: blood

testing, serum lipid profile test, serum thyroid stimulating hormone screening test, urine screening, increased and more in-depth physical examinations by a physician, assessment of symptoms by a physician to determine if further testing is necessary, monitoring of blood pressure, and diagnostic testing such as electrocardiograms, ultrasounds, colonoscopy, sigmoidoscopy, CT scans, PET scans, MRI studies and X-rays.

168.    These tests, procedures and health monitoring can increase the likelihood of early detection, allow for earlier intervention and treatment, and reduce the mortality rate for Plaintiffs and Members of the Class/Subclasses.

169.    These tests, examinations and procedures are different from the medical care normally recommended for other individuals of similar age and sex as they are highly specialized in order to assess and monitor conditions that would not be necessary in the absence of exposure to PFOS and PFOA.

170.    Further, these tests, examinations and procedures would occur more frequently that the normal recommended schedule of examinations that would occur in the absence of exposure to PFOS and PFOA.

171.    The prescribed monitoring regime is reasonably necessary according to contemporary scientific principles.

## COUNT II

## Negligence

172.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if they were set forth at length herein.

173.     The Defendants had a duty to design, engineer, manufacture, develop, fabricate, test, sell, and/or distribute AFFF in a manner that avoided harm to those who foreseeably would come into contact with it.

174.     As discussed, supra, Defendants knew or should have known that the manufacture, distribution and sales of AFFF containing PFOS and PFOA was hazardous to human health and the environment.

175.     Defendants further knew or should have known that it was unsafe and/or unreasonably dangerous to manufacture, distribute and sell AFFF containing PFOS and PFOA because it was inevitable that said harmful and defective products migrate off of the Bases and contaminating the ground water and potable/drinking water supply of the Bases and Affected Area.

176.     The Defendants also knew or should have known that PFCS are highly soluble in water, and highly mobile and highly persistent in the environment, and highly likely to contaminate water supplies if released to the environment.

177.     The Defendants marketed and sold their products, AFFF, with knowledge that large quantities of their toxic, harmful and defective product, AFFF,

would be used in training exercises and in emergency situations at Military bases in such a manner that dangerous chemicals would be released into the environment.

178.    The harm caused by the Defendants' harmful and defective products to the Classes/Subclasses was reasonably foreseeable.

179.    The drinking/potable water of the public and private wells in the Affected Area are contaminated with unsafe levels of PFOS and PFOA.

180.    As a result of Defendants' negligent, reckless and/or intentional acts and omissions alleged herein, both the public and private drinking/potable water supplies in the Affected Area are contaminated with PFOS and PFOA.

181.    Defendants' negligent manufacture, sale, or distribution of AFFF caused and continues to cause unknowing Plaintiffs and Class/Subclass members an increased risk of associated diseases/illnesses due to the presence of PFOS and PFOA in their drinking water.

182.    Defendants' failure to warn/sufficiently warn of the effects of their harmful and defective products resulted in the contamination of private and public drinking/potable water supplies with PFOS and PFOA.

183.    As a result of Defendants' conduct stated herein, members of the Class/Subclasses have suffered and continue to suffer a loss of use and enjoyment of their properties, and their contaminated properties are less attractive to prospective buyers/renters and have diminished in value.

184.    As a further consequence of the contaminated water infiltrating their

private wells, many individuals in the class/subclasses have suffered and continue to suffer economic loss in efforts to remove PFOA and PFOS contaminates from the drinking/potable water.

185.    In addition, individuals in the class/subclasses serviced by public water systems have suffered and continue to suffer economic loss as a result of the public water authorities being forced to purchase alternative sources of drinking/potable water.

186.    Defendants' acts were willful, wanton or reckless and conducted with a reckless indifference to the rights of Plaintiffs and members of the Class/Subclasses.

187.    As a direct and proximate result of Defendants' actions and/or omissions, Plaintiffs and the Class/Subclasses have suffered and continue to suffer damages, including medical monitoring damages; monetary damages associated with the investigation, treatment, remediation. and monitoring of their drinking/potable water; increased costs to obtain drinking/potable water; and property damages, including, without limitation, loss of value, annoyance, disturbance, intrusion, harassment and inconvenience; all for which Plaintiffs and the Subclasses are entitled to recover damages.

## COUNT III

### Defective Product - Failure to Warn

188.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if they were set forth at length herein.

189.    At all times relevant, Defendants were in the business of, among other things, designing, engineering, manufacturing, developing, fabricating, testing, selling,

and/or distributing AFFF.

190.    As designers, engineers, manufacturers, developers, fabricators, testers sellers, and/or distributers of a commercial product, the Defendants had a duty to provide reasonable instructions and adequate warnings about the risks of injuries and harmful effects to human health and the environment posed by their products.

191.    Defendants knew or should have known that the foreseeable storage, use and disposal of the AFFF that they designed, engineered, developed, fabricated, tested manufactured, sold, and distributed had the capacity to enter the water supply, to persist there for decades, and to cause harm to human health, property and the environment.

192.    These risks were not obvious to users of the AFFF.

193.    Upon information and belief, the Defendants failed to provide warnings to the users that use of Defendants' harmful and defective product could result in the contamination of groundwater and drinking/potable water supplies.

194.    Upon information and belief, the Defendants failed to provide warnings to the users of the dangers to human health. property and the environment if their harmful and defective product was permitted to contaminate the groundwater or drinking/potable water supply.

195.    Sufficient and adequate instructions and warnings would have reduced or avoided the foreseeable risks of harm posed by the Defendants' harmful and defective

products.

196.     Had Defendants provided adequate warnings, the users of their AFFF would have taken adequate measures to store, use, and dispose of AFFF so as to reduce or eliminate groundwater and drinking/potable water contamination from AFFF.

197.     As a result of Defendants' failure to warn against the likelihood of contamination from their AFFF, the groundwater and drinking/potable water became contaminated with toxic PFOS and PFOS.

198.     As a direct and proximate result of Defendants' failure to warn of the environmental and health impacts caused by their harmful and defective product, AFFF, the drinking/potable water supplies in and around the Affected Area became contaminated with PFOS and PFOA and have caused health risks to Plaintiffs and the Subclasses.

199.     Defendants' failure to provide adequate warnings or instructions rendered Defendants' AFFF a defective product.

200.     As a direct and proximate result of Defendants' designing, engineering, manufacturing, developing, fabricating, testing, selling, and/or manufacturing, or distributing of a defective product, Plaintiffs and the Class/Subclasses have suffered and continue to  suffer  damages, including medical monitoring damages; monetary damages associated with the investigation , treatment, remediation, and monitoring of their drinking/potable water; increased costs of drinking/potable water; economic loss,

property damages, including, without limitation, loss of value, annoyance, disturbance, intrusion, harassment and inconvenience; all for which Plaintiffs and the Class/Subclasses are entitled  to recover damages.

201.    As a result of Defendants' manufacture, sale, or distribution of a defective product, Defendants are strictly liable in damages to the Plaintiffs and the Class/Subclasses.

202.    Defendants' acts were willful, wanton or reckless and conducted with a reckless indifference to the rights of Plaintiffs and members of the Class/Subclasses.

## COUNT IV

### Defective Product - Design Defect

203.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if they were set forth at length herein.

204.    At all times relevant, Defendants were in the business of, designing, engineering, manufacturing, developing, fabricating, testing, selling, and/or distributing AFFF.

205.    Defendants negligently designed, engineered, developed, fabricated and tested AFFF and PFCs, and thereby failed to exercise reasonable care to prevent the AFFF and the components from presenting an unreasonable risk of harm to human health and the environment and persons who would come in contact with it, including Plaintiffs and the Plaintiff Class/Subclasses.

206.    It was foreseeable that toxic chemicals from the AFFF that Defendants

designed, engineered, developed, fabricated, tested, manufactured, sold and distributed would enter the water supply of the Plaintiffs and the Classes/Subclasses and cause harm to their persons, and property and the environment.

207.    Alternative designs of AFFF were available, technologically feasible and practical, and would have reduced or prevented the harm to Plaintiffs and the Class/Subclasses.

208.    A reasonable alternative design would, at a reasonable cost, have reduced or eliminated the foreseeable risks of harm posed by AFFF.

209.    The AFFF designed, engineered, developed, fabricated and tested manufactured, sold, or distributed by the Defendants was defective in design because the foreseeable risk of harm posed by the AFFF could have been reduced or eliminated by the adoption of a reasonable alternative design.

210.    Defendants' products were defective at the time of manufacture, and at the time they left Defendants' control.

211.    As a result of Defendants' designing, engineering, manufacturing, developing, fabricating, testing, selling, and/or distributing designed product, the drinking/potable water supplies in and around the Bases became contaminated with dangerous and toxic chemicals and damaged the Plaintiffs and the Class/Subclasses.

212.    As a direct and proximate result of Defendants' designing, engineering, manufacturing, developing, fabricating, testing, selling, and/or manufacturing, or distributing of a defective product, Plaintiffs and the Class/Subclasses have suffered

and continue to suffer damages, including medical monitoring damages; monetary damages associated with the investigation , treatment, remediation, and monitoring of their drinking/potable water; increased costs of drinking/potable water; economic loss, property damages, including, without limitation, loss of value, annoyance, disturbance, intrusion, harassment and inconvenience; all for which Plaintiffs and the Class/Subclasses are entitled to recover damages.

213.    As a result of Defendants' designing, engineering, manufacturing, developing, fabricating, testing, selling, and/or distributing a defective product. Defendants are strictly liable in damages to the Plaintiffs and the Class/Subclasses.

214.    Defendants' acts were willful, wanton or reckless and conducted with a reckless indifference to the rights of Plaintiffs and members of the Subclasses.

## DAMAGES SOUGHT BY THE CLASS

215.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if they were set forth at length herein.

216.    Plaintiffs and the Class/Subclasses seek damages sufficient to fund a medical monitoring program that is reasonably tailored to the exposure risks posed by PFOS and PFOA as described supra.

217.    Plaintiffs also seek damages sufficient to fund a blood testing program to pay for the costs of an initial blood test, and such follow-up blood tests that are deemed necessary, to determine the current levels of PFOS and PFOA in the blood serum of the Plaintiffs and the Class/Subclasses.

218.     Plaintiffs and the Class/Subclasses seek monetary damages for each violation including the continuing violations of the Counts set forth supra. In particular, Plaintiffs and the Class/Subclasses seek monetary damages:

> (i)     sufficient to remediate class members' property from the contamination caused by Defendants' conduct or, i n the alternative, to compensate class members for the diminution in value of their property caused by Defendants' conduct;
>
> (ii)     to compensate class members for the loss of use and enjoyment of their properties caused by Defendants' conduct;
>
> (iii)     for the Private Well Class/Subclass, for the increased costs to obtain drinking water, including the costs of alternative drinking water sources or the installation and maintenance of an adequate filtration system(s);
>
> (iv)     for the Public Well/Water Class/ Subclass, for the increased costs of water that they will bear as rate-payers as a result of Defendants' conduct; and
>
> (v)     for such other monetary damages as are required to fully compensate Plaintiffs and the Class/Subclasses for the loss of value of their properties caused by Defendants' conduct.

219.     Plaintiffs and the Subclasses seek punitive damages in an amount sufficient to deter Defendants' similar wrongful conduct in the future.

220.     In addition to the above, Plaintiffs and the Class/Subclasses seek injunctive relief including, but not limited to, implementation of a mandatory testing protocol requiring Defendants to expeditiously test the wells of all Private Well Class/Subclass members for the presence of PFOS and Pf-OA and to continue that testing until it is determined that the risk of PFOS and PFOA contamination in private wells has ended; to install permanent filtration devices on any private well testing positive for the presence of PFOS and/or PFOA, and to maintain those filtration devices pursuant to industry best practices; to establish and fund a blood testing program for

Plaintiffs and members of the Class/Subclasses; to establish and fund a medical monitoring program  for Plaintiffs and members of the Class/Subclasses; and to take all steps necessary to remediate the Affected Area such that all public and private water supplies of the Public Water and Private Well Plaintiffs and Class/Subclasses are free from the presence of PFOS and PFOA.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs, on behalf of themselves and all others similarly situated, request the Court to enter judgment against the Defendants, as follows:

A.      An order certifying the proposed Class and Subclasses of: Public Water Subclass, Private Well Subclass, and Non-Property Owner Subclass. and designating Plaintiffs as the named representatives of the respective Subclasses, and designating the undersigned as Class Counsel;

B.      An order requiring Defendants to:

(i)      implement a testing protocol to test the wells belonging to each member of the Private Well Class/Subclass;

(ii)     install permanent filtration devices on any private well testing positive for the presence of PFOS and PFOA, or to facilitate the transition for Private Well Class/Subclass to connect to a public water supply;

(iii)    establish a blood testing program for Plaintiffs and the Class/Subclasses;

(iv)     establish a medical monitoring protocol for Plaintiffs and the Class/Subclasses to monitor individuals' health and diagnose at an early stage any ailments associated with exposure to PFOS and PFOA; and,

(v)      take all necessary steps to remediate the property and/or residences of Plaintiffs and the Class/Subclasses to eliminate the presence of PFOS and PFOA;

C.      An award to Plaintiffs and Class/Subclass members of compensatory, exemplary, and consequential damages, including interest, in an amount to be proven at trial;

D.      An award of attorneys' fees and costs;

E.      An award of pre-judgment and post-judgment interest, as provided by law; and,

F.      Such other and further relief as the Court deems just and proper.


Respectfully submitted,

Creedon & Feliciani, P. C.


By: _____
      Joseph L. Feliciani

By: _____
      Heather A. Thomas

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all issues in this action so triable of right.